Joshua M. Fried (CA Bar No. 181541)
John W. Lucas (CA Bar No. 271038)
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Tel: 415.263.7000
Fax: 415.263.7010
Email: jfried@pszjlaw.com
       jlucas@pszjlaw.com

Proposed Counsel for the
Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re:<br><br>UNI-PIXEL, INC.<br>UNI-PIXEL DISPLAYS, INC.<br><br>Debtors. | Case No.: 17-52100 MEH<br><br>(Jointly Administered with<br>Case No. 1752101)<br><br>Chapter 11<br><br>**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION FOR ORDER APPROVING BID PROCEDURES FOR THE SALE AND AUCTION OF DEBTORS' ASSETS; AND SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE [DOCKET NO. 40]**<br><br>Judge: Honorable M. Elaine Hammond<br>Date:  October 12, 2017<br>Time   10:30 a.m.<br>Place: Courtroom 3020<br>       United States Bankruptcy Court<br>       280 South First Street<br>       San Jose, CA 95113 |

The Official Committee of Unsecured Creditors (the "Committee") of Uni-Pixel, Inc. and Uni-Pixel Displays, Inc., in the above-captioned cases (together, the "Debtors"), hereby files its objection (the "Objection") to the Debtors' *Motion for Order Approving Bid Procedures for the Sale and Auction of Debtors' Assets; Approving Bid Protections; and Scheduling an Auction and Hearing*

*to Consider the Sale* [Docket No. 40] (the "Bidding Procedures Motion"), regarding the proposed bidding and sale procedures for substantially all of the Debtors' assets. In support of the Objection, the Committee respectfully represents as follows:

## I.

## INTRODUCTION[1]

The Committee agrees with the Debtors that a prompt sale of substantially all of the Debtors' assets is necessary. However, the Committee cannot support the expedited sale of the assets pursuant to the Bidding Procedures Motion in its current form. The bidding procedures do not provide the Committee with any confidence that the proposed sale process will result in maximizing the value of the Debtors' assets because they are not designed to foster a competitive bidding process. The Committee's belief is justified for the following reasons:

- The Bid Protections are Not Standard or Necessary: The proposed bid protections or break-up fee will chill the bidding process and are unnecessary, as the sale is not preserving the business as a going concern. For an estate that admittedly has little or no cash, the proposed Break-Up Fee is exorbitant, $75,000, or 4.6% of the purchase price. Plus, when the initial overbid increment ($150,000) is added to the Break-Up Fee, the bid protections represent $225,000, or approximately 15% of the purchase price. This will chill bidding as the initial purchase price is only $1,500,000. Given that this is not a going concern sale and that setting a bidding floor does not justify the payment of a Break-Up Fee, the Committee believes that the Break-Up Fee is wholly unnecessary, and that the initial overbid should be limited to $50,000.

- Insufficient Marketing Process: The Debtors admit that little to no marketing occurred, but assert that any additional marketing is unlikely to benefit to the estate. This assertion is surprising to the Committee, as proposed counsel to the Committee has already received two calls from prospective buyers, and referred these parties to the Debtors counsel. Additional time spent marketing the assets will only increase the potential of a competitive bidding process.

- Not Providing Reasonable Due Diligence Periods Chills Bidding: The Debtors state in the Bidding Procedures Motion and the *Motion for Order Approving Sale of Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests and Granting Related Relief* [Docket No. 38] (the "Sale Motion") that "Future Tech was the only potential purchaser that presented both an

---

[1] Capitalized terms not defined in the Introduction shall have the meanings ascribed to them below.

acceptable purchase price and willingness to purchase the Assets on an expedited basis without a requirement for due diligence." Bidding Procedures Motion Pg. 12; Sale Motion Pg. 40. However, Future Tech had previously completed a due diligence investigation. *Id*. Other interested parties, who may not have a prior relationship with the Debtors, may require additional time to perform their due diligence investigations. Refusing to qualify bidders who seek a reasonable due diligence period chills bidding and will not maximize value.

- <u>Concerns over the Integrity of the Process</u>: The Committee has two concerns over the integrity of the process. First, the Committee is concerned that Future Tech's sale deposit is a disguised debtor in possession loan. Section 2.1.2.1 of the APA provides that the deposit may be used for the expenses of the Debtors, and that Future Tech shall be entitled to credit against the deposit for any amounts paid to Key Personnel (as defined in the APA) (when the Debtors do not have any employees) prior to the execution date or the purchase price if paid after the execution date but prior to closing. The Debtor should not be permitted to use the deposit to pay any employees or fund operations, as this would amount to a debtor in possession loan, and would require separate approval from the Court.

The Bidding Procedures Motion states that the Debtors have no employees, other than Hawthorne, and his role is unclear given he is the sole director and "principal executive officer." If Debtors need individuals to manage the sale process or maintain assets pending closure of the sale (all of which is outside the ordinary course of business), Debtors at the very least should provide the Committee with: (i) number of individuals needed, (ii) their role, (iii) term of employment, (iv) amount of compensation for each person; and (v) budget. Absent Court approval, the Debtors should be required to consult with Committee on all hires and obtain Committee consent on terms of their employment or engagement.

Second, the Committee is concerned that the Debtors have committed to pay Bridge Bank in full, in exchange for its support of the sale, despite not performing an analysis of Bridge Bank's asserted secured claim and the perfection of any security interest. There is no cash collateral motion, no proof of claim on file, and no allowance of Bridge Bank's claim at this time. The Committee requires time to investigate the loan, including whether the loan was property perfected, and no money should be paid to secured creditors until the claim is properly allowed.

- <u>The APA is Unclear as to Which Debtor owns the Assets</u>: The preamble of the APA states that the agreement is between Uni-Pixel, Inc. and Future Tech Capital, LLC. However, the APA is signed by both Uni-Pixel, Inc. and Uni-Pixel Displays, Inc. The APA is unclear as to the

assets that are owned by each debtor, and whether Uni-Pixel Displays, Inc. owns any of the assets. Even if the Debtors operated as a single unit, each debtor will have different claims against it. Thus, it will be necessary to allocate the proceeds of any sale, and the APA should be revised accordingly.

- **Committee Participation In The Sale Process**: The Committee's involvement in the sale process is critical because of the severe lack of marketing and the expedited timeline. Accordingly, the Committee should be involved in all aspects of the sale, including the identification of potential bidders and the selection of the highest and best offer to ensure the greatest possible distributions are made to creditors.

- **The Sale Timeline Should Be Flexible**: Bidders have been given approximately three weeks to conduct diligence and raise the necessary cash to make a competing offer. If the Debtors and the Committee determine that more time is necessary for potential purchasers to conduct diligence or negotiate further terms, the parties should be authorized to extend the various deadlines, milestones, and auction date without further order of the Court, subject to a reasonable outside date.

Notwithstanding the foregoing, the Debtors intend to forge ahead with an auction without any guarantee of a competitive process or a reasonable expectation that the process will maximize the value of the Debtors' assets. For these reasons and the reasons set forth more fully below, the Bidding Procedures Motion should be denied as presented or continued to a later date with a direction that the Debtors immediately engage the Committee to revise the bidding procedures in response to the points raised herein.

## II.

**THE BID PROCEDURES FAIL TO PROVIDE FOR THE IMPLEMENATION OF A PROCESS THAT ENSURES THE DEBTORS WILL RECEIVE THE HIGHEST AND BEST OFFER**

**A.** **The Court Should Deny the Break-Up Fee and Reduce the Initial Overbid**

Under the Asset Purchase Agreement (the "APA"), dated September 29, 2017, between Uni-Pixel, Inc. and Future Tech Capital, LLC ("Future Tech"), the purchase price is set at $1,500,000. APA § 2.1.1. Bid protections can vary, but generally fall into the rage of 3% of the purchase price. Here, however, the "Break-Up Fee" is $75,000, equal to 4.6% of the purchase price. APA § 10.4.1.3. Taken together with the $150,000 initial overbid, the bidding protections are approximately 15% of the purchase price. The Committee believes that the bid protections in their current form will

prevent competitive bidding and foreclose the possibility of receiving higher and better offers. Accordingly, the Committee requests that the Break-Up Fee be denied, and that the initial overbid be reduced to $50,000, with subsequent overbids at $25,000.

### i. The Break-Up Fee and Initial Overbid Sought by the Bid Protections are Not Actual and Necessary Costs of Preserving the Estate and Should be Denied

Courts have held that the party requesting approval of bid protections (i.e. break-up fees) has the burden under section 503(b) of the Bankruptcy Code to show that they are "actual, necessary costs and expenses of preserving the estate." *In re Reliant Energy Channel View LP*, 594 F.3d 200, 206 (3d Cir. 2010). The Court in *In re Reliant Energy* held that there is "no compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Id.* In summarizing its reasoning, the court in *Reliant Energy* held that:

> [I]n considering requests for break-up fees, we would apply the general standard used for all administrative expenses—the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Focusing specifically on break-up fees, we noted that it was permissible to offer a break-up fee and reimbursement for expenses to induce an initial bid, provided the allowance of the fee does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition.

*Id.* (internal quotations and citations omitted).

Here, the Committee believes that the Debtors and Future Tech have not satisfied their burden of showing that the Break-Up Fee and overbid requirement sought by the bid protections are actual and necessary costs of preserving the estate. On the contrary, the Committee believes that the bid protections, which total 15% of the purchase price when including the overbid requirement, are exorbitant and harm the estate because they will deter others from bidding (i.e., they are designed to ensure that Future Tech is the sole and winning bidder). Importantly, this is not a going concern sale, and thus, the Break-Up Fee is completely unnecessary because there is not a business to preserve but assets that Future Tech or some other will attempt to use in connection with their business. Thus, the Court should not allow the Break-Up Fee, and should reduce the initial overbid requirement to $50,000.

### ii. The Debtors Are Not Entitled to Business Judgement Deference and the Break-Up Fee is Unreasonable

Courts can and do exercise independent review of a debtor's request for approval of proposed break-up fees and expense reimbursements. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that a proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected); *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992) (holding that the analysis conducted by the bankruptcy court must include a determination that "all aspects of the transaction are in the best interests of all concerned."). In the bankruptcy context, "bidding incentives such as break-up fees and bid increment limitations are carefully scrutinized in § 363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *Id.*

The standard is not whether the break-up fee is within the business judgment of the debtor (as asserted by the Debtors here), but whether the transaction will further the diverse interests of the debtor, creditors and equity holders, alike. *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994). More importantly, no particular deference should be given to debtor's business judgment <u>when the debtor is liquidating rather than reorganizing</u>. *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995).

Here, the Court should not defer to the business judgement of the Debtors because the Debtors are liquidating. There is no question that the proposed Break-Up Fee, equaling 4.6% of the purchase price, is outside the bounds of reasonableness and will chill bidding. More importantly, when the initial overbid requirement ($150,000) is taken into consideration, any competing bidder would have to submit an overbid that represents approximately **<u>15%</u>** of the purchase price in order to have a chance as being selected as the successful bidder. This means that any successful over bidder must offer a cash purchase of $1,650,000 plus $75,000 (plus any of the deposit the Debtors are proposing to use). The Debtors cite no cases in support of a 15% initial overbid, citing only cases with a maximum overbid of 9.5%. The bid protections will not further the interests of the Debtors and other parties in interest, will not maximize the value of the assets to the estate, and will not

encourage competitive bidding. Accordingly, the Court should not give any deference to the Debtors' business judgment and hold that the Break-Up Fee is wholly unnecessary because this is a liquidating case. Further, the initial overbid should be reduced to $50,000.

### iii. *The Break-Up Fee is Not Necessary to Induce Future Tech's Bid*

Where the breakup fee is not necessary to induce a stalking horse bidder to bid, courts will routinely deny breakup fees. *See, e.g., In re Reliant Energy Channel View LP*, 594 F.3d at 208 (breakup fee denied when bidder "made its bid before the auction knowing that it might not receive a break-up fee, and a retroactive grant of a break-up fee could not have induced a bid that [bidder] already had made"); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 536-37 (3d Cir. 1999) (denying breakup fee when such fee was not necessary to induce bidder to bid).

In *O'Brien*, the Third Circuit disallowed a break-up fee and expense reimbursement because the original bid was lured by the prospect of purchasing the debtor cheaply, rather than the prospect of a break-up fee. *O'Brien*, 181 F.3d at 537. The Third Circuit also rejected the stalking horse bidder's argument that the break-up fee was warranted because it induced the stalking horse to research the value of the debtor and convert that to a dollar figure on which other bidders can rely. *Id.* However, the Third Circuit noted that "the record in this case suggests that Calpine had strong financial incentives to undertake the cost of submitting a bid, including the cost of researching the company's worth, even in the absence of any promise of reimbursement." *Id.*

Here, there is no evidence that Future Tech would refuse to participate in the auction if it were denied the Break-up Fee. The main reason presented for inclusion of the Break-Up Fee in the Bidding Procedures Motion was that Future Tech expended "time, energy and resources" (Bidding Procedures Motion Pg. 18), and that the Break-Up Fee will be used to "reimburse Future Tech for the costs incurred in serving as the stalking horse whose bid will be subject to higher and betters offers." Bidding Procedures Motion Pg. 21. The Debtors only provide a short statement in support of the Break-Up Fee, that the Break-Up Fee was "the minimal protection necessary to ensure Future Tech's participation in the Sale Process." Bidding Procedures Motion Pg. 18.

Importantly, the Sale Motion states that Future Tech entered into a non-binding letter of intent with the Debtors prior to the bankruptcy filing, indicating that Future Tech may have agreed to

participate in a sale without any break-up fees. Bidding Procedures Motion Pg. 11. The Committee submits that the Debtors have not carried their burden of proving that the Break-Up Fee was necessary to induce Future Tech's bid. Accordingly, the Break-Up Fee should be denied.

B.  **Proceeding Without Providing for Reasonable Due Diligence Chills Bidding**

The Debtors state in the Bidding Procedures Motion that "Future Tech was the only potential purchaser that presented both an acceptable purchase price and willingness to purchase the Assets on an expedited basis **without a requirement for due diligence**." Bidding Procedures Pg. 12 (emphasis added). However, the Debtors admit that Future Tech previously performed a due diligence investigation. The Bidding Procedures Motion provides that Future Tech was approached as a potential bidder "[b]ecause of management's prior engagement with Future Tech, **its prior due diligence investigation of Debtors** and the pre-filing execution of a non-binding letter of intent between the companies, management hoped that Future Tech would continue to pursue a potential transaction." *Id*. (emphasis added).

Future Tech should not benefit from its prior due diligence investigation at the expense of chilling bidding by not allowing other interested parties to perform customary and reasonable due diligence investigations. The Bidding Procedures Motion noted that other interested parties were unwilling to proceed without the customary due diligence period. *Id*. In order to have a competitive sale process, all parties must be afforded equal opportunity to investigate the Debtors. Refusing to qualify bidders who seek a reasonable due diligence period will chill bidding and should not be permitted.

C.  **The Debtors' Assets Have Not Been Marketed Sufficiently**

The Motion contains no information that would allow the Court to conclude that the Debtors have properly marketed their assets. As fiduciaries for their estates, the Debtors have an obligation to develop a marketing and bid process that will maximize the value of their assets. *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate.") (citing *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992)). Accordingly, when seeking approval of a sale outside the ordinary course of business, as the Debtors

are doing here at a rapid pace, a debtor is required to demonstrate that it obtained the highest and best price for the assets to be sold, regardless of whether the sale is to be conducted privately or through an open auction process. *See In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (holding that "[i]n general, to receive approval of a proposed sale of assets, the debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer"); *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (holding that "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

Here, the Debtors have essentially performed no marketing of their assets, and state "it is highly speculative whether such additional time or financial advisor would have significantly altered the process for soliciting bids." Bidding Procedures Motion Pg. 11. This assertion is surprising to the Committee, as counsel for the Committee has already received calls from two interested parties, and has referred these parties to counsel for the Debtors. Due to the insufficient nature of the Debtors' marketing efforts, the Committee (and the Debtors) needs additional time to identify potential interested parties. Because the Debtors admit they are embarking on a rapid sale process, it is critical to ensure that their assets have been and will continue to be properly marketed. Without additional marketing, the Debtors will be unable to demonstrate that they obtained the highest and best price for the assets to be sold.

### D. Concerns Over the Integrity of the Process

The Committee has two concerns over the integrity of the process. First, the Committee is concerned that the deposit provided for under the APA may be a disguised loan to the Debtors. Section 2.1.2.1 of the APA provides that the deposit may be used for the necessary expenses of the Debtors, and that the Future Tech shall be entitled to credit against the deposit any amounts paid to Key Personnel (as defined in the APA) prior to the execution date or the purchase price if paid after the execution date but prior to closing. The Bidding Procedures Motion states that "the APA provides for Future Tech to be reimbursed for designated expenses actually paid to the Colorado landlord, but those will not reduce the Purchase Price, and for repayment of amounts paid to Key

Personnel, expenses that would not ordinarily be assumed by a buyer of assets prior to closing." Bidding Procedures Motion Pg. 17. The Debtors should not be permitted to use the deposit to pay any employees or fund operations, as this would amount to a loan and require separate approval from the Court. The Bidding Procedures Motion states that the Debtors have no employees, other than Hawthorne, and his role is unclear given he is the sole director and "principal executive officer," and that the Debtors do not have any available cash to pay employees. Bidding Procedures Motion, Pgs. 9-10. Further, if the Debtors need employees to manage the sale process or maintain assets pending closure of the sale, and absent separate Court authorization, the Debtors need to provide the Committee with: (i) number of individuals needed, (ii) their role, (iii) term of employment, (iv) amount of compensation for each person; and (v) a budget. Anything short of this provides the Debtors with an unsupervised role of spending the little cash available (before there is any) without regard to unsecured creditors.

Second, the Committee is concerned that the Debtors may have committed to pay Bridge Bank in full, despite not performing an analysis of Bridge Bank's security interests and perfection of liens, in exchange for Bridge Bank's consent to the proposed sale free and clear of its interests. The Committee requested information from the Debtors regarding Bridge Bank's asserted claim and the review will need to be completed before any sale proceeds are paid outside a plan. If the Debtors do not intend to investigate Bridge Bank's claim, the Committee must be permitted to investigate Bridge Bank's claim, including whether the loan was property perfected, and no money should be paid to secured creditors until the claim has been allowed.

### E. **The APA is Unclear as to Which Debtor owns the Assets**

The APA is unclear as to the assets that are owned by each debtor, or if any assets are owned by Uni-Pixel Displays, Inc. Even if the Debtors operated as a single unit, each debtor will have different claims filed against it, and thus, it will be necessary to allocate the proceeds of any sale. Without clarity as to which debtor owns certain assets, it will not be possible to allocate the sale proceeds. Thus, the APA should be revised to clearly state which entity owns the assets being sold.

## F. The Committee Must be Involved in the Sale Process

Currently, the bidding procedures do not provide any participation or consultation rights to the Committee. Given the inadequate marketing process and expedited timeline in this case, it is critical that the Committee be permitted to attend the auction and be actively involved in all aspects of the sale process including, but not limited to, determining proof of financial ability to perform, qualifying bids, overbids, modifications to overbid increments, successful bids, backup bidders, conduct of the auction, and evaluation of the highest and best offer. Any order approving the bidding procedures should incorporate the Committee's participation in all aspects of the sale process.

## G. The Sale Timeline Should be Flexible

The Debtors and the Committee should be authorized to adjust the various deadlines, milestones, and the auction date without having the estate incur any economic consequence to Future Tech or other potential bidders. Under this expedited timeline, having flexibility when negotiating with potential bidders is important. As stated above, the Debtors' assets have not been sufficiently marketed. Before the bid deadline, the Debtors and the Committee will attempt to engage many potential bidders. It is common and beneficial when negotiating an asset purchase agreement with competing parties to extend various deadlines if the Debtors and Committee reasonably believe that such action will preserve or enhance the prospect of receiving a higher and better offer.

The best way for the Debtors, the Committee, and their advisors to ensure that a robust marketing process will continue through the bid deadline is to have flexibility when negotiating. If both the Debtors and the Committee are in agreement to extend these deadlines, they should be authorized to file a notice with the Court that sets forth the new deadlines without having to incur the unnecessary expense of obtaining further authorization from the Court, or the consent of Future Tech.

## III.

## CONCLUSION

The law is well-settled that a debtor has a fiduciary obligation to maximize the value of their estates for the benefit of all stakeholders. Accordingly, when seeking approval of a sale outside the

ordinary course of business, as the Debtors are doing here at a rapid pace, a debtor is required to demonstrate that its bidding procedures are well-balanced, designed to foster competitive bidding, and obtain the highest and best price for the assets to be sold. The Committee believes that the bidding procedures in their current form will chill any competitive bidding and result in a sale of the assets to Future Tech at a below market price. Unless the changes discussed herein are incorporated, the Committee respectfully requests the Court to deny the Bidding Procedures Motion.

## IV.

## RESERVATION OF RIGHTS

The Committee will continue to engage the Debtors regarding the proposed terms and conditions of the Bidding Procedures Motion, the APA, or any other sale, and work to resolve any disagreements consensually. This Objection, however, only relates to the Bidding Procedures Motion, not the terms and conditions of the APA or any other asset purchase agreement the Debtors may accept. Accordingly, the Committee reserves all rights to object to the APA, the Sale Motion, or any other asset purchase agreement accepted by the Debtors prior to the sale hearing.

Dated: October 11, 2017　　　　　　　　　PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ John W. Lucas*
　　Joshua M. Fried
　　John W. Lucas

　　Proposed Counsel for the Official
　　Committee of Unsecured Creditors