1　McNUTT LAW GROUP LLP
　　SCOTT H. McNUTT (CSBN 104696)
2　MICHAEL C. ABEL (CSBN 187743)
　　THOMAS B. RUPP (CSBN 278041)
3　219 9th Street
　　San Francisco, California 94103
4　Telephone: (415) 995-8475
　　Facsimile: (415) 995-8487
5
　　Attorneys for Debtors
6

7

8　　　　　　　UNITED STATES BANKRUPTCY COURT

9　　　　　　　NORTHERN DISTRICT OF CALIFORNIA

10　　　　　　　　　SAN JOSE DIVISION

11　In re　　　　　　　　　　　　　Case No. 17-52100 MEH
　　　　　　　　　　　　　　　　　(Jointly Administered with
12　UNI-PIXEL, INC.,　　　　　　　Case No. 17-52101)
　　UNI-PIXEL DISPLAYS, INC.,
13　　　　　　　　　　　　　　　Chapter 11
　　　　　　　　Debtors.
14　　　　　　　　　　　　　　　**DEBTORS' MOTION FOR AUTHORITY
　　　　　　　　　　　　　　　TO ESTABLISH AND ADMINISTER KEY
15　　　　　　　　　　　　　　　EMPLOYEE INCENTIVE PROGRAM**

16　　　　　　　　　　　　　　　Judge:　Hon. M. Elaine Hammond
　　　　　　　　　　　　　　　Date:　TBD
17　　　　　　　　　　　　　　　Time:　TBD
　　　　　　　　　　　　　　　Place:　280 South First Street
18　　　　　　　　　　　　　　　　　　Courtroom 3020
　　　　　　　　　　　　　　　　　　San Jose, California  95113
19

20

21　　　　　　　　　**I.  INTRODUCTION**

22　　　　Uni-Pixel, Inc. ("Uni-Pixel") and Uni-Pixel Displays, Inc. ("Displays" together with Uni-

23　Pixel, the "Debtors"), the debtors and debtors in possession in these jointly administered cases,

24　hereby request an order authorizing the Debtors to establish and administer a proposed Key

25　Employee Incentive Program (the "KEIP") as set forth below (the "KEIP Motion").

26　　　　The KEIP provides that 15% of (i) the proceeds from the proposed sale of the Debtors'

27　assets, (ii) recoveries from certain accounts receivable, and (iii) recoveries from insurance for

28　foreign accounts be set aside as compensation to the three former members of the Debtors'

management, whose efforts have been and will continue to be indispensable to the marketing and sale of the Debtors' assets and pursuing recovery under existing accounts. Although former management has worked diligently for months to market, sell, and close a transaction, they have received no compensation. The KEIP is their only means to receive compensation for their past and future work.

The KEIP Motion is based on the memorandum of points and authorities set forth herein, the DECLARATION OF CHRISTINE RUSSELL IN SUPPORT OF MOTION FOR AUTHORITY TO ESTABLISH AND ADMINISTER KEY EMPLOYEE INCENTIVE PROGRAM (the "Russell Declaration") filed concurrently herewith, the pleadings and papers on file herein, and such other oral or documentary evidence as may be submitted before the Court.

By this motion, the Debtors seek an order authorizing the Debtors to establish and administer the KEIP, a copy of which is attached as an exhibit to the Russell Declaration. The KEIP is necessary to incentivize critical personnel to continue to perform at a high level, without distraction, while assuming additional roles and performing services beyond the duties required by their former positions, in order to maintain and maximize the value of the Debtors' assets for the benefit of creditors of the bankruptcy estates. The three people included in the KEIP are Jeff Hawthorne (former CEO), Christine Russell (former CFO) and Jalil Shaikh (former COO). Notwithstanding that these individuals have not been paid for three months, they have continued to devote their full attention to these bankruptcy cases, and they have been absolutely essential in soliciting and negotiating an offer to purchase substantially all of the Debtors' assets.

## II. **JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. **BACKGROUND**

### A. **Background of the Debtors**

Uni-Pixel is a public company that makes transparent conductive films and flexible electronic films, based on a proprietary manufacturing process, used in touch-based electronic

products.  The process offers precision micro-electronic circuit patterning and modification of surface characteristics over a large area on an ultra-thin, clear, flexible, plastic substrate.  These flexible films may be incorporated into computer, tablet, printer, and smartphone touch sensors, as well as automotive applications.  Uni-Pixel sells its screens/films under the brand name "XTouch" as sub-components of a fully assembled touch module.

In addition to the flexible electronic films described above, Uni-Pixel developed a hard coat resin that can be applied using film, spray, or inkjet coating methods for applications as protective cover films, a cover lens replacement, or a hard coat for plastics.  The hard coat resin provides glass-like performance and optical clarity in a thin, flexible, and shatterproof format.  It provides exceptional scratch resistance and durability without compromising optical clarity.  The hard coat resin and optical films are sold under the brand name "Diamond Guard."

Uni-Pixel is headquartered in Santa Clara, California.  Manufacturing was done at the Uni-Pixel facility in Colorado Springs, Colorado.  Uni-Pixel has a facility in Texas, but those operations (primarily research and development) were being consolidated into the Colorado Springs facility during the summer of 2017.

B.    **Current Status**

As a result of the judgment in the Delaware Chancery Court[1] and the sweep of the Debtors' bank accounts, the Debtors terminated all employees, including officers, prior to the filing of the bankruptcy cases.  Jeff Hawthorne, the Debtors' former CEO, is currently Uni-Pixel's sole director and the Principal Executive Officer.  Christine Russell, the Debtors' former CFO, is currently Uni-Pixel's Principal Accounting Officer.  Mr. Hawthorne and Ms. Russell serve in these capacities without any employment agreement or terms of compensation.  Jalil Shaikh, the Debtors' former Chief Operating Officer, has continued to work with Mr. Hawthorne and Ms. Russell in connection with the efforts to arrange a sale of the Debtors' assets.  There is no employment

_____

[1]  For a more complete discussion of the Debtors' background and operations, parties should review the DECLARATION OF JEFF HAWTHORNE IN SUPPORT OF *EX PARTE* APPLICATION FOR ORDER AUTHORIZING JOINT ADMINISTRATION OF CHAPTER 11 CASES, filed on September 20, 2017 [Docket No. 26].

MOTION TO ESTABLISH AND ADMINISTER KEY EMPLOYEE INCENTIVE PROGRAM

{00065989.}

agreement or terms for compensation for Mr. Shaikh. Collectively, Mr. Hawthorne, Ms. Russell and Mr. Shaikh are referred to herein as "Former Management."

The Debtors have shut down the manufacturing facility and taken steps to secure all equipment and materials used in the manufacturing processes, including safe storage of any chemicals. The Colorado Springs facility has been shut down. The Debtors are still in the process of decontaminating and decommissioning the equipment there.

## C.    Sale Efforts

Uni-Pixel believes a prompt sale of its assets is in the best interests of its creditors. Uni-Pixel aggressively pursued a sale of all of the Debtors' assets. On the petition date, Former Management sent solicitation packages to all parties that might be interested in acquiring the Debtors' assets. The pool of prospective purchasers is limited to a small number of identifiable companies, because only parties that are extremely familiar with the Debtors' business and assets would be able to make an offer on the expedited basis necessary. Former Management received a number of responses to the solicitation materials. There have been numerous meetings, phone calls, and emails with parties interested in purchasing the Debtors' assets. In addition to managing the shut-down of the facility and safe storage of materials, Former Management has been working full time on pursuing a sale.

As a direct result of Former Management's efforts, the Debtors have reached an agreement with a buyer on the essential terms for a sale of their principal assets, subject to negotiation and documentation of final terms. The Debtors filed the MOTION FOR ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND GRANTING RELATED RELIEF (the "Sale Motion") and MOTION FOR ORDER APPROVING BID PROCEDURES FOR THE SALE AND AUCTION OF DEBTORS' ASSETS; APPROVING BID PROTECTIONS; AND SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE (the "Bid Procedures Motion") on October 2, 2017. The hearing on the Sale Motion is scheduled for November 2, 2017.

MOTION TO ESTABLISH AND ADMINISTER KEY EMPLOYEE INCENTIVE PROGRAM

## IV.  RELIEF REQUESTED

The KEIP is an incentive-based compensation program premised on the consummation of the sale of the Debtors' assets and/ or collection of additional amounts from accounts receivable or insurance.  In developing the KEIP, the Debtors carefully evaluated what would be necessary to accomplish the desired goals and to preserve value, including specifically identifying possible purchasers with regard to the sale of assets.

Former Management has a critical skill-set relating to a possible asset sale.  They know the companies that would be interested in the assets.  They have specific experience and knowledge of, among other things, the Debtors' intellectual property, equipment, data systems, internal operations, and customer base.  They have established relationships with key customers and vendors and companies.  They are also familiar with outstanding accounts and have relationships with the account debtors that will be essential to collecting outstanding amounts.

Former Management comprises the proposed participants in the KEIP (collectively the "KEIP Participants").  The KEIP Participants are invaluable and must remain involved and fully engaged in the sale process because the required work did not stop with the execution of the asset purchase agreement.  The KEIP Participants continue to work with the stalking horse bidder, the landlord of the facility to prepare the equipment for disassembly and removal.  The KEIP Participants have also been working with any parties interested in participating in the auction process and submitting an overbid.  They are also critical to the process of identifying collectable accounts and have relationships that will be important to recovering on the accounts.

The three KEIP Participants have undertaken all of the management responsibilities of a company in a Chapter 11 reorganization.  They have undertaken efforts to secure all of the Debtors' assets, respond to requests from creditors, and reach out to prospective purchasers to solicit offers to purchase the Debtors' assets.

/ / /

/ / /

/ / /

/ / /

MOTION TO ESTABLISH AND ADMINISTER
KEY EMPLOYEE INCENTIVE PROGRAM

1  The KEIP will commence upon approval by the Bankruptcy Court and will terminate upon

2  the distribution of funds received from the Transaction[2] and other amounts recovered from

3  accounts receivable or from insurance proceeds in accordance with the allocation set forth in the

4  KEIP.

5  The three KEIP Participants will share in an Incentive Pool equal to fifteen percent (15%)

6  of the cash and cash equivalents actually received by the estate from a sale of the Debtors' assets.

7  Distributable Proceeds will not include deferred, contingent, escrowed or other consideration not

8  paid in cash as of the Transaction Date. KEIP Participants will also be entitled to 15% of accounts

9  receivable that are collected and any amounts paid pursuant to foreign accounts receivable

10  insurance (if accounts receivable are not collectable).

11  The Incentive Pool will be allocated evenly between the three KEIP Participants. In order

12  to receive payments from the Incentive Pool, the KEIP Participants will be required to sign a

13  general release of all claims against the Company, including administrative claims for service to

14  the estate.

15  In sum, the KEIP is a narrowly tailored plan, payable only upon consummation of a sale,

16  developed after a comprehensive, detailed analysis by the Debtors, designed to incentivize a

17  distinct group of personnel who are invaluable to the Debtors to achieve a maximum return from a

18  sale.

19  ## V.  AUTHORITY FOR RELIEF

20  **A.**     **The KEIP is Authorized Under Section 363(b)**

21  Section 363(b) provides, in relevant part, that a debtor-in-possession "after notice and a

22  hearing, may use, . . . other than in the ordinary course of business, property of the estate." 11

23  U.S.C. § 363(b). In analyzing section 363(b), courts will authorize the use, sale or lease of estate

24  property outside the ordinary course of business when there is a "sound business purpose" that

25  justifies the transaction. *See Dai-Ichi Kangyo Bank Ltd v. Montgomery Ward Holding Corp. (In*

---

[2] Capitalized terms not defined in the motion shall have the meaning set forth in the KEIP (attached to the Russell Declaration).

6

Case: 17-52100   Doc# 66   Filed: 10/20/17   Entered: 10/20/17 13:44:58   Page 6 of 15

MOTION TO ESTABLISH AND ADMINISTER
KEY EMPLOYEE INCENTIVE PROGRAM

{00065989}

re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) (adopting "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) ("[T]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)."); *Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (applying standard from *Lionel Corp.* in context of proposed "use" of estate property); *Travelers Insurance Co. v. Plaza Family Partnership*, 95 B.R. 166, 173 (Bankr. E.D. Cal. 1989) (citing both *Continental* and *Lionel Corp.* in context of proposed "use" of estate property). The business judgment rule shields a debtor's management from judicial second-guessing. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to trustee's judgment concerning use of property under section 363(b) when there is legitimate business justification).

Thus, under section 363(b), a debtor must establish a valid business purpose for the proposed use of estate property outside the ordinary course of business. *In re Lionel Corp.*, 722 F.2d 1070-71. Thereafter, the business judgment rule applies to create "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992). Because "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence," courts generally uphold management's exercises of business judgment "as long as they are attributable to any rational business purpose." *In re Integrated Resources, Inc.*, 147 B.R. at 656 (internal citations and quotations omitted).

Historically, courts have approved employee compensation programs pursuant to section 363(b)(1) when: (1) a debtor has used proper business judgment in formulating such a program, and (2) the court found that the program was fair and reasonable. *See, e.g.*, *Montgomery Ward*, *supra*, 242 B.R. at 154. (affirming bankruptcy court approval of key employee retention program

on basis that debtors showed "sound business purpose" justifying such approval); *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) ("Compensation issues are normally governed by the business judgment standards, i.e., proof that there is a broad business purpose for an action. The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.") (citations omitted); *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) (applying business judgment rule and approving incentive plan which was within debtor's fair and reasonable business judgment).

Here, the Debtors have determined that the Company requires certain key employees to remain focused and provide their maximum efforts while fulfilling myriad duties, including duties in addition to those required in their former roles, without distraction, in servicing and enhancing certain aspects of the Company for the sale. With this goal in mind, the Debtors developed the KEIP which they believe will assist in motivating the KEIP Participants. To be clear, the KEIP Participants have not been paid since all employees were terminated. The Debtors are not paying their regular salaries, and the KEIP Participants have taken on the task of preparing the Debtor's business for a sale, as well as marketing the assets, on the hope that the KEIP will be approved and they will be paid from the proceeds of a sale. Consequently, implementation of the KEIP, as proposed herein, is well within the Debtors' fair and reasonable business judgment rule and is authorized under section 363(b).

## B. KEIP Payments May be Allowed As Administrative Expenses Under Section 503(b)(1)

"After notice and a hearing, there shall be allowed administrative expenses . . . , including the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case . . ." 11 U.S.C. § 503(b)(1)(A). "The claimant must show that the debt asserted to be an administrative expense (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." *In re DAK Industries, Inc.*, 66 F. 3d 1091, 2094 (9th Cir. 1995). The timing of payment for administrative claims is normally left to the discretion of the

1   Court.  *In re Verco Industries*, 20 B.R. 664, 665 (B.A.P. 9th Cir. 1982).  However, administrative

2   expenses incurred in the ordinary course of business are normally paid by the Trustee as they are

3   incurred.  11 U.S.C. § 363(c).

4   **C.**      **Sections 503(c)(1) and (c)(2) Are Inapplicable to This KEIP**

5           Section 503 imposes restrictions on the compensation that a debtor can pay its executives

6   and other employees in bankruptcy, which include a general prohibition on retention payments

7   unless certain strict conditions are met.  *United Mine Workers of Am. 1974 Pension Plan & Tr. v.*

8   *Alpha Nat. Res., Inc.*, 553 B.R. 556, 558 (E.D. Va. 2016).  Section 503(c)(1) limits any "transfer

9   made to, or [any] obligation incurred for the benefit of, an insider of the debtor for the purpose of

10  inducing such person to remain with the debtor's business."  *Id.*

11          In addition to section 363(b), employee compensation programs should be considered

12  under section 503(c) which prohibits the allowance and payment of administrative expenses under

13  certain circumstances.  Generally, section 503(c)(1) prohibits payments to insiders "for the

14  purpose of inducing such person to remain with the debtor's business," i.e., retention payments,

15  without meeting certain specified criteria; section 503(c)(2) prohibits payments of severance to

16  insiders without meeting certain specified criteria; and section 503(c)(3) prohibits payments

17  "…outside the ordinary course of business and not justified by the facts and circumstances of the

18  case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or

19  consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(1)-(3).

20          Based on the statute's plain language, neither of sections 503(c)(1) and (2) apply to the

21  KEIP which is solely an incentive-based program with no severance component whatsoever.  The

22  Debtors, however, are cognizant that there exists sensitivity to the proposal of programs which are

23  facially incentive programs but are actually retentive in nature.  As explained by one bankruptcy

24  court:

25          Attempts to characterize what are essentially prohibited retention programs as
            "incentive" programs in order to bypass the requirements of section 503(c)(1) are
26          looked upon with disfavor, as the courts consider the circumstances under which
            particular proposals are made, along with the structure of the compensation
27          packages, when determining whether the compensation programs are subject to
            section 503(c)(1).

28

{00065989.1}

MOTION TO ESTABLISH AND ADMINISTER
KEY EMPLOYEE INCENTIVE PROGRAM

See, e.g., *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) (stating that if bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)").

Notably, the case cited in *In re Dana Corp.*, involved a proposed "completion bonus" which the court determined would be "awarded without regard to performance or creditor recovery" if the recipient remained with the company on the effective date of a confirmed plan. The court concluded that such benchmark, which is a goal of any chapter 11 case, constituted a retention, and not an incentive, bonus, and therefore must satisfy the criteria under section 503(c)(1). *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006). That case, therefore, is inapposite to the instant circumstance where the KEIP is awarded based only on consummation of the sale, and therefore based on performance with a direct tie to creditor recoveries.

If, in considering whether to approve a management incentive plan, courts did not weigh the level and materiality of the retentive nature of the plan, all payments to insiders would be subject to section 503(c)(1). For example, in *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007), the court explained that section 503(c)(1) is invoked with "a transfer made to . . . an insider of the debtor for the [primary] purpose of inducing such person to remain with the debtor's business." *Id*. at 802. Other courts similarly have examined which competing purpose, retention or incentive, is primary. As one court explained, "merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature." *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006). Applying the section 503(c)(1) analysis there, that court held: "By presenting an executive compensation package that properly incentivizes the CEO and Senior Executives to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply." *Id*. at 584.

A Delaware bankruptcy court similarly has explained that section 503(c)(1) does not apply "if a bonus plan is not primarily motivated to retain personnel." *In re Global Home Products*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (finding section 503(c)(1) inapplicable to proposed plans that were "primarily incentivizing and only coincidentally retentive").

Here, the proposed incentive payments are based on the consummation of two separate milestones: (a) completion of a Sale Transaction; and (b) collection of accounts receivables or

payment under insurance for certain uncollectable foreign accounts receivable. The KEIP simply contains no retention or severance components. Inherently, each KEIP Participant must remain with the Company through the completion of the Sale Transaction to receive his or her share of the Incentive Pool; however, this is a necessary ramification of the implementation of the program and is not intended to induce the KEIP Participants to stay. Instead, the requirement that KEIP Participants remain through the Sale Transaction ensures that each KEIP Participant performs at a high level, fully satisfies his or her duties to the Company and executes the additional services and tasks required by the sale process which are imperative to maintaining the Company's critical business aspects and enhancing the value of the Debtors' assets being sold. Therefore, the KEIP is properly characterized as a performance-based incentive plan and not as a retention plan for insiders subject to the requirements of sections 503(c)(1) and (c)(2). Further the component of the KEIP relating to recovery of accounts receivable is appropriate because the Debtors believe that the personal relationships of the KEIP Participants with the account debtors will be critical to collecting the AR. It would be impractical to simply sue to collect the accounts receivable because many of the account debtors are overseas companies and the costs of collection would be prohibitive.

**D.     The KEIP Satisfies Section 503(c)(3) and Is in the Interests of Creditors**

While sections 503(c)(1) and (c)(2) do not apply here, nonetheless, "a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of the chapter 11 case . . . the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A)." *Dana Corp.*, 358 B.R. at 576. Accordingly, the Court may evaluate the KEIP, which proposes payments outside of the ordinary course of business, under section 503(c)(3).

Courts that have analyzed the prohibition on "other transfers" in section 503(c)(3) have applied a standard based upon the standard applied under section 363(b). Specifically, transfers are permitted if made in the exercise of a debtor's business judgment and warranted by the facts

and circumstances of the case. *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011); *Dana Corp.*, 358 B.R. at 576 (applying "sound business judgment" standard); *Global Home Prods.*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."). As set forth above and in the Russell Declaration, it is well within the Debtors' reasoned business judgment that the KEIP is necessary to incentivize the KEIP Participants to continue providing their services at the highest level possible, in order to maintain and enhance the value of the Company and its assets for the sale. Accordingly, section 503(c)(3) is satisfied. However, notwithstanding the foregoing, the Debtors note that at least one court applying section 503(c)(3) has considered a second standard in addition to the business judgment standard. In *In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009), a Texas bankruptcy court opined that the "justified by the facts and circumstances" language from section 503(c)(3) "suggests…that Congress intended the court to play a more critical role in assessing transactions, at least those with insiders, that fall within the ambit of section 503(c)(3)" and then concluded:

> [S]ection 503(c)(3) is intended to give the judge a greater role: even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it. The court reads this requirement as meaning that the court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.

*Id*. at 237. The *Pilgrim's Pride* decision, therefore, contemplates, at least with respect to insiders, an independent review by the court as to whether a proposed incentive plan serves creditors' interests. Regardless of whether or not *Pilgrim's Pride* is binding on this Court, the KEIP undoubtedly satisfies the test articulated by *Pilgrim's Pride*.

As set forth in the Russell Declaration, the KEIP Participants each are necessary to continue the going concern of the businesses to ensure that the Company maintains value and the estates receive a maximum return from the Sale Transaction. The Debtors identified specific and necessary business aspects and irreplaceable employees. The KEIP is a narrowly tailored plan

MOTION TO ESTABLISH AND ADMINISTER KEY EMPLOYEE INCENTIVE PROGRAM

intended to incentivize the KEIP Participants to assume significant additional roles, ultimately to achieve the largest possible return from the sale and from the collection of accounts receivables, while ensuring that operational costs remain in check, which will provide for greater distributions to the benefit of the estates' creditors. It is indisputable, therefore, that the KEIP is in the best interests of creditors.

The facts and circumstances of this case strongly favor some sort of KEIP. The KEIP Participants have not been paid in months. They have no possibility for payment unless the Transaction closes and this motion is granted. It is patently unreasonable to suggest that the KEIP Participants' former management positions obligate them to do all that they have done and to continue devoting essentially full time efforts to the Transaction and this case. The KEIP Participants have gone far beyond was required of them and they should be entitled to some form of compensation for their extraordinary efforts.

On the other hand, without the KEIP, it is likely that the KEIP Participants will not be motivated to focus all of their efforts on satisfying their current and additional duties and successfully consummating the most lucrative possible sale. The KEIP Participants each are managing more work, devoting more time and handling more duties, beyond what their respective positions require. They have made personal sacrifices to remain with the Debtors in a situation where future employment is uncertain at best.[3] There exists, therefore, a grave concern that the KEIP Participants will not extend themselves to perform at a high level and assume multiple responsibilities needed to facilitate the sale processes, but instead will divert their focus to other matters, including seeking alternative employment under more promising circumstances or executing the bare minimum required by their positions until a sale, if any, is consummated or the Debtors are simply liquidated and dissolved. At this critical juncture where the focus should be on maximizing value and marketing the Debtors' value to close a sale, the Company cannot afford for

---

[3] Former Management has not entered into any agreements with Future Tech. The Debtors expect that Future Tech, or other successful overbidder, would want to discuss future employment. Former Management is open to having these discussions with Future Tech or other successful purchaser once the Transaction is closed, but there have not been any such discussions to date.

1  its key employees to lose morale or dedication to fulfilling their roles.  The ramifications will be

2  deleterious to the Company's value, to the chances of a successful sale with the highest return,

3  and, ultimately, to the creditors of the estates.  The incentive proposed under the KEIP to the KEIP

4  Participants is therefore essential.

5  There is ample precedence of courts applying section 503(c) and approving incentive

6  programs, such as the KEIP, based upon the future performance of the debtor, or upon the amount

7  realized upon the sale of the debtor.  *See, e.g.*, *In re Borders Group, Inc.*, 453 B.R. at 474

8  (additional compensation reasonable when "keyed to the achievement of [specific financial

9  benchmarks], distributions to unsecured creditors, and either a section 363 going concern sale or

10  the filing of a reorganization plan in short order"); *In re Nellson Nutraceutical, Inc.*, 369 B.R. at

11  801-03 (approving management incentive plan based on EBITDA targets); *In re Global Home*

12  *Products*, 369 B.R. at 785-86 (approving incentive plans based on EBITDA and sales targets); *In*

13  *re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *3-4 (Bankr. D. Del. Jan. 19, 2006)

14  (approving incentive plan based on sale price of debtor).

15  Consequently, under both the business judgment standard and the *Pilgrim's Pride*

16  "interests of creditors" standard, the KEIP satisfies section 503(c)(3), and the Debtors respectfully

17  submit that the Court should authorize them to implement the plan.

18  **E.  The KEIP Is Warranted Under Section 105(a).**

19  Bankruptcy Code Section 105 provides that "[t]he court may issue any order, process, or

20  judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.

21  § 105.  As detailed above, the KEIP is critical to the Debtors' efforts to maximize the value of

22  their estates through the consummation of a sale. The maximum, focused efforts of the KEIP

23  Participants in enhancing and maintaining the Company's value in consummating the sale, and

24  thus, maximizing the return for the Debtors' creditors, are essential to the Debtors. The costs

25  associated with the KEIP are reasonable and necessary and are justified by the benefits that the

26  Debtors will realize as a result of the indispensable services and know-how of the KEIP

27  Participants.  The KEIP, therefore, is warranted under section 105(a).

28

# VI.  CONCLUSION

WHEREFORE, the Debtors pray that this Court enter its order as follows:

1.      Granting the Motion;

2.      Approving the KEIP, including the payments to be made thereunder;

3.      Authorizing the Debtors to establish and administer the KEIP; and

4.      For such other and further relief as the Court deems just and proper.


DATED: October 20, 2017                          MCNUTT LAW GROUP LLP



                                        By:  _____/s/ *Michael C. Abel*_____
                                             Michael C. Abel
                                             Attorneys for Debtors

MOTION TO ESTABLISH AND ADMINISTER
KEY EMPLOYEE INCENTIVE PROGRAM