MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
MICHAEL C. ABEL (CSBN 187743)
THOMAS B. RUPP (CSBN 278041)
219 9th Street
San Francisco, California 94103
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>UNI-PIXEL, INC.,<br>UNI-PIXEL DISPLAYS, INC.,<br><br>    Debtors. | Case No. 17-52100 MEH<br>(Jointly Administered with<br>Case No. 17-52101)<br><br>Chapter 11<br><br>**REPLY IN SUPPORT OF DEBTORS' MOTION FOR AUTHORITY TO ESTABLISH AND ADMINISTER KEY EMPLOYEE INCENTIVE PROGRAM**<br><br>Judge: Hon. M. Elaine Hammond<br>Date: December 7, 2017<br>Time: 10:30 a.m.<br>Place: 280 South First Street<br>    Courtroom 3020<br>    San Jose, California |

## I. <u>INTRODUCTION</u>

Uni-Pixel, Inc. ("Uni-Pixel") and Uni-Pixel Displays, Inc. ("Displays" and together with Uni-Pixel, the "Debtors"), the debtors and debtors in possession in these jointly administered cases, hereby submit this reply in support of their DEBTORS' MOTION FOR AUTHORITY TO ESTABLISH AND ADMINISTER KEY EMPLOYEE INCENTIVE PROGRAM (the "KEIP Motion") filed on October 20, 2017 [Docket No. 66]. The KEIP Motion requests an order authorizing the Debtors to establish and administer a Key Employee Incentive Program (the "KEIP") as set forth therein.

On November 30, 2017, the United States Trustee filed an opposition to the KEIP Motion. The UST's opposition prioritizes form over substance. There was no money available to pay the KEIP participants. The only possible source of funds was the potential proceeds of a sale of the Debtors' assets. There were numerous obstacles to an asset sale, including: (i) there would not be any time for due diligence by a buyer, (ii) there was no available cash to operate the business, (iii) there was a significant risk that the technology transfer would not happen because the Debtors lacked the employees to facilitate it, (iv) no license agreements from CIT or Microchip were included in the Sale, (v) Microchip held a potentially large administrative claim, and (vi) the pool of potential purchasers was limited to those who were familiar with the business and technology of the Debtors.

Nonetheless, the KEIP participants made the decision to commit their time and efforts to pursue a sale in the hope that they would generate sufficient sale proceeds to pay at least some of the unpaid pre-petition employee wages. Their commitment and diligent efforts allowed a sale to close less than 90 days after the cases were commenced. The estate appears to be administratively solvent, and there will be funds available to be turned over to a Chapter 7 trustee when the cases are converted.

The KEIP had been contemplated since the beginning of the cases, and the KEIP participants understood that they would not receive any compensation for their efforts outside of the KEIP. These cases have proceeded extremely rapidly since the voluntary petitions were filed on August 30. In approximately 30 days, the Debtors negotiated an agreement to sell their assets to Future Tech, negotiated procedures for an auction, and filed motions to approve the procedures and the sale. The Debtors also negotiated a cash collateral agreement with Western Alliance Bank and the administrative rent agreement with Microchip Technology, Inc. during the time they were preparing the KEIP Motion. This all happened in a very short time, and it is simply incorrect to suggest that the KEIP was only conceived of after the sale was already on its way to being approved.

There is no plausible argument that the KEIP is a retention bonus. Payment from the KEIP to its participants was always contingent on a successful sale of the Debtors' assets during these

chapter 11 cases. The KEIP participants understood that they would receive no other compensation. They made the decision to work toward a sale and now face the risk that they will be deemed to have "volunteered" their time and effort.

## II. ARGUMENT

### A. The KEIP Participants Have Agreed to a Cap of $150,000

As a result of productive discussions with the Creditors Committee, the Debtors and the KEIP participants have agreed to revise the requested incentive compensation. The total amount of funds paid into the KEIP will be capped at $150,000. The money will be funded as follows: $51,000 from general estate funds and $99,000 from the ESW Deposit. The Debtors spent a substantial amount of time and effort fulfilling the complex financial and organizational diligence requested by ESW (which contributed to ESW's willingness to allow the Debtors to retain $99,000 of ESWs deposit in connection with the sale efforts). The Debtors are drafting a motion under Bankruptcy Rule 9019 to approve a settlement with ESW to be heard as soon as practicable. This should resolve the Committee's reservation of rights to object.

### B. The KEIP Participants Offered a Substantial Benefit to the Estate

The benefit to the estate of the sale transaction was considerably more than the purchase price of $1.5 million. Future Tech also agreed to pay $80,000 in administrative rent to Microchip for the Debtors' Colorado Springs facility (a minimum of $240,000 and a maximum of $400,000). Future Tech also agreed to pay $50,000 toward hazardous cleanup costs. Further, without a deal, Microchip's administrative claim could have been $750,000 to $1,000,000 (based on their estimate of potential cleanup costs and other charges under the lease for which Uni-Pixel would have been responsible). Thus, the "deal" was worth more than the $1.5 million purchase price. Accordingly, the revised KEIP ($150,000 total with only $51,000 from the sale proceeds) is eminently reasonable.

### C. Employees Were Terminated Due to Lack of Money to Pay Them

Employees were terminated pre-petition because management understood that it would expose the estates to tremendous liability (as well as be wholly improper) if they continued to employ anyone when there was no reasonable basis to believe that there would be a source of

funds to pay the employees. Management did not distinguish between management and ordinary employees in the decision to terminate all of the Debtors' employees. However, the KEIP participants continued to perform their duties, including preparations to file two bankruptcies while working to identify a purchaser for the assets. Arguing that the KEIP participants were not "employees" and hence ineligible for the KEIP would be placing form over substance. Without the KEIP participants, a successful sale never would have been achieved.

If the KEIP is not approved, the KEIP participants will likely have claims for their wages from the Petition Date forward. They continued to serve in their original roles, and even assumed additional work. Based on their pre-petition salaries, their claims for post-petition wages would likely exceed their expected disbursements under the KEIP. Mr. Hawthorne, Mr. Shaikh, and Ms. Russell earned $305,000, $300,000, and $280,000 respectively. Their projected KEIP distributions would be less than nine weeks of their prepetition salaries on average. Further the estates would incur additional costs litigating over any potential administrative claims asserted by the KEIP participants.

D. **The Timing of the KEIP Motion Does Not Negate the Incentive Goals Reached Under the KEIP**

The timing of the filing of the motion was a result of the frenzy of activity around the sale. The KEIP participants had to locate and identify potential purchasers immediately after filing the bankruptcy petitions on August 30. A deal was struck with Future Tech, and the Sale Motion and Bid Procedures Motion were filed October 2. Shortly afterward, the Administrative Rent Motion, Cash Collateral Motion, and KEIP Motion were filed. Although the KEIP Motion was filed after the Sale Motion, the KEIP participants continued to work with the prospective purchaser to keep the sale on track, as well as meet with other prospective purchasers to seek potential overbids. From the very beginning of the bankruptcy process, the KEIP participants understood that they would be entitled to an incentive payment only if they successfully closed a sale of the Debtors' assets.

The KEIP participants made the decision to work toward a sale. They devoted significant time and effort to the process knowing that it might all be wasted effort if an acceptable auction

and sale process could not be negotiated. There were significant obstacles to a sale, and the KEIP participants overcame them all.

It is somewhat disingenuous to suggest that the timing of the KEIP Motion's filing controls or affects the outcome of the KEIP Motion. The KEIP Motion was filed on October 20 because the sale took precedence. The Debtors noted in their status conference statement filed on October 5, 2017 [Docket No. 49], that they intended to file the KEIP Motion. As noted above, the KEIP participants were able to negotiate an acceptable purchase offer in approximately 30 days. They also proposed an auction and overbid process, and negotiated an agreement for payment of administrative rent. Further, the KEIP participants continued to work toward a successful auction process and closing the sale with Future Tech. These efforts continued well after the Sale Motion was filed.

The UST's reliance on *Residential Capital* is somewhat misplaced. That case involved a debtor that employed various professionals to assist with the sales, even though the sales were substantially agreed to prior to filing the chapter 11 case. Here, the Debtors never employed an investment banker, broker, or similar professional, as every effort was made to reduce administrative expenses. Indeed, the *only* chance of a reasonably successful outcome in this case was always through the KEIP participants taking on additional responsibilities to deliver a benefit to the estate, especially to the Debtors' former employees. Now that they have accomplished this result, they should be compensated for their efforts.

E. **The KEIP is Not a Retention Plan**

This is not a retention plan, where the KEIP participants would be paid a bonus to avoid changing jobs. The KEIP participants were "all in" trying to find a purchaser and conclude a sale of the Debtors' assets. They knew from the outset that they were not going to receive their regular salaries and that their only potential source of payment would be from the proceeds from a sale. This cannot in any way be construed as a retention "bonus" because if no sale was completed, the KEIP Participants would have received *nothing*.

It is beyond doubt that a sale of the Debtors' assets would not have been possible without the efforts of the KEIP participants. Mr. Shaikh and Mr. Hawthorne knew all the parties that

would be likely purchasers of estate assets. Ms. Russell also had key relationships with interested parties. The three of them reached out to the entire market of potential purchasers. They had numerous conversations and meetings with prospective purchasers, ultimately securing a deal with Future Tech as a stalking horse bidder. Even after reaching an agreement with Future Tech, they continued to encourage additional parties to participate in an auction sale of the Debtors' assets. Their efforts yielded two overbids: ESW Capital and Industrial Assets. But for the unfortunate result of the "change in control" study, there would have been a significant upside for the estate through ESW sponsoring a plan of reorganization and providing DIP financing. With the work of the KEIP participants, the Debtors were able to close the Future Tech sale on a very short timeline: less than one week after the Sale Order was entered. The Sale Order was entered on November 8 (a little more than two months after these cases were commenced) and the transaction was closed on or about November 15, with the bank's claim paid in full by that time. This was the best possible result under the circumstances, and the only reason there is any possibility of a distribution to priority unsecured creditors is because of the KEIP participants' efforts. It would be remarkably unfair for them to receive nothing in return.

### III. CONCLUSION

The KEIP participants performed the work that resulted in the sale and potential distribution for creditors. To deny them any compensation for their efforts would elevate form over substance to reach a wildly unjust result, especially where the "found money" from ESW significantly reduces the impact to the estate. Effectively, the KEIP participants will be paid only $51,000 from the proceeds of the sale with Future Tech (with $99,000 coming from ESW's deposit). The KEIP Motion should be granted.

DATED: December 5, 2017          McNUTT LAW GROUP LLP

By:      /s/ *Michael C. Abel*
        Michael C. Abel
        Attorneys for Debtors